Whenever you're ready, Mr. Becker. Mr. Restrepo, may it please the court. I'm Chip Becker. With me is my colleague Cory Woods, and together we represent the plaintiffs Savannah Byers, Cynthia Barnes, and Cody Ashe. This case calls for an assessment of whether, under Pennsylvania law, the defendant Carlisle Finishing Technologies assumed a responsibility to act reasonably regarding training that Carlisle was providing the folks who worked in the paint mixing facility at the Letterkenny Army Depot in central Pennsylvania. What's your best evidence of record here that they, with respect to safety training? With regarding whether they assumed a responsibility to address the dangers of the equipment. And to provide safety training. Well, so, okay, so let me ask the question, but in two parts. First, at the risk of not answering the court's question, I want to follow for a moment with the concept of safety training, right? There is a construct that the defendants have offered that the trial court embraced, that there is a distinction, a meaningful distinction between what I'll call operational training, how to push buttons and work levers on one hand, and safety on the other, as if the using of the equipment and the safety of the equipment are meaningfully distinct. And one proposition that, you know, was developed in the record below and that we would advance for your honor's consideration is that what you're talking about here is equipment that features volatile chemicals that are capable of evaporating into an enclosed space, that are capable of igniting and capable of exploding. These folks were working in something that was capable of functioning like, and tragically did here, function like a bomb. And so the operation of the equipment is, safety is baked in to how you operate the equipment, and Carlisle's own awareness of this is evidenced, and this is a more direct answer to your question, in two different spaces of the record. One is just to kind of focus on where the case has focused in the district court, and certainly where the district court herself focused, is in the training that Carlisle provided in May 2018 to the folks who worked in the paint mixing facility. That was Mr. Hagedorn, right. And that training, although again, after the fact, they would say, well, they were just there to talk about how to push the buttons, but that training itself, Mr. Hagedorn, in his own deposition, talked about the fact that correct use of the equipment is safe use of the equipment. This is the theme that I was just offering, that there isn't a meaningful, there is no functional distinction between the operation of the equipment and the safety of the operation of the equipment. It's all part and parcel. So to testify, there were no operators in the training sessions. I'm sorry. There were no operators of the machinery in those training sessions. Well, those training sessions were directed to the people who worked in the facility. You'll forgive me, I don't have, at my immediate recall, who was in attendance at those trainings. They were not operators. Does that make a difference? I don't think it does, because the training, what they're doing in that training session is talking about how to interact safely with that equipment. And in that session, he talks about, among other things, the necessity to properly ground the equipment. Why is grounding important? Because grounding prevents electrical discharge. Electrical discharge is what can ignite the volatile chemicals and cause an explosion. Electrical discharge is why people should be wearing and should have been trained and advised to wear clothing that would prevent electrostatic or static electricity and electrostatic discharge. It's why people should have been trained on what kind of tools they were using in the room and how they were moving barrels around the room. All of which, and this is the second part, all of which was discussed by Carlisle in their manuals, which they provided in combination with the equipment itself. Mr. Becker, your theory seems an awful lot like it's going to be an end run around the limits of product liability litigation. I mean what is there here that amounts to an assumption of duty given how limited the Pennsylvania Supreme Court is telling us in the case versus Kumar we're not supposed to go around creating entirely new forms of liability? Well, this is not, Judge Vivas, this is not a strict liability. This is not a products liability case per se. This is a case about the adequacy of the training that was provided and the assumption of a responsibility to train appropriately. So it is a negligent complaint. You talk about undertaking to include warning labels, provide safety manuals, give general safety tips. It's normally the duty is on the employer. What is there that satisfies the high assumption? Well, it's not high and it's not narrow. Whether one assumes as under Pennsylvania law, the starting point, there is no presumption of narrowness. It's not particularly high, once again. The question is what are the choices that here the defendant makes? When a defendant chooses under Pennsylvania law to render services that it knows or reasonably should know are necessary for the protection of another, it assumes a corresponding duty to perform that undertaking with reasonable care. Does the underlying contract, if there is a contract, I know that 324A speaks of contract and gratuitous, but let's just talk about contract. Does the underlying contract have any bearing on the extent of the 324A duty? It could. So a contract is in the context of tort duties as opposed to contract duties. In the context of tort duties, the creation, the performance, the nonperformance of a contract can be part of the evidentiary landscape. It can really be part of the story about how a defendant here assumes or undertakes to act for the protection and safety of another. A contract here is not a limiting principle, but it's certainly part of a story. Let me just give you a hypo where a contract might be a limiting principle. Let's just say that there is an elevator that needs tuned up, and the property owner says to the elevator repair company, I'd like you to tune this up. And the elevator repair company says, sure, that's eight hours of work. And the property owner says, nope, not in the budget. Pay you for one. The elevator repair person comes, spends one hour doing it. They know when they leave that there might be some cables that might not have been fully inspected, that the pulleys might not have been fully greased. They know that they've got a duty problem here. They didn't do the eight hours they needed. Is that elevator repair company liable at that point in time for not doing the full eight hours that would be the duty to the third parties that would use the elevator? Judge Phipps, let me parse out two different concepts. Are they ultimately liable? Did in the end they act reasonably or not? That's an interesting question. I know it's going to be a duty point for you. They might have acted reasonably or not under those circumstances. But you think they have a duty. Did they undertake by virtue of the contract, by virtue of more importantly than the contract itself, by virtue of engaging with the project, did they undertake to render services that they know or reasonably should know are necessary for the safety of another? Yes, they did. And therefore they assumed a duty of reasonable care. So even if they were told to leave after one hour, they said, you know what, you're only paying me for an hour, but I want to stay. I have a duty. I have a duty. The Pennsylvania Supreme Court would say I have a duty. I want to stay. And they said, no, no, no. I know you're going to bill me for this. Just leave. So Judge Phipps, they emphatically have an important argument regarding whether they did or did not act reasonably under the circumstances. They certainly have a cross claim. But Pennsylvania law starts with the proposition that everyone is capable of being held liable. Everyone is potentially liable for their actions. And whether they have that response and whether they are potentially liable is a function of whether they have assumed that responsibility to act reasonably. And that assumption of responsibility dials back to choices. Now, people do after the fact people recognize those choices. This is a little like personal jurisdiction. Right. Someone can undertake to act in a state and they don't necessarily concede that by acting in a state they have under they have assumed the jurors they have subjected themselves to the jurisdiction of the state. But whether they after the fact, whatever they believe, whatever subjectively they think, whatever they argue, what matters is the decisions that they made. And our proposition is that Carlisle made a series of decisions around the production of this, the manufacturer of this equipment, the warnings that they associated with equipment, the training itself, under which they assume the duty of reasonable. But the but others up kind of the chain could have purchased more training. Right. Like there was the option for more training here. And they might and and and they might also be responsible. Now, there's workers' compensation issues. There's all kinds of issues. Yeah. But the fact of I'm sorry, Judge Davis. Yeah. OK, I do want to point out, I mean, you fundamentally making a three twenty four a argument. I mean, if we're going to if we're going to use the parlance of the restatements. Yes. Right. Then then I mean, go on. Three twenty four a requires reliance. Most cases that impose a duty impose the duty only when there's reliance. How how did the letter Kenney employees rely on Carlisle to teach them general safe practices? They're experienced. Presumably the employer trained them. There's already OSHA regulation. So where is the reliance that is kind of intertwined with there being a duty? Well, a couple of thoughts. First of all, as you know, the restatement restatements three twenty three and three twenty four a which are closely related do not represent independent bodies of law. They're not even law. Right. They are referenced and used by the Pennsylvania Supreme Court as as illustrations of as as illustrations of what Pennsylvania law is. So our reference point, of course, is not what the American Law Institute has has has published, but rather Pennsylvania law and where Pennsylvania law begins, whether we're going to think about this under the rubric of three twenty three, where we talk about someone assuming a duty in relation to to to another or three twenty four, where we talk about duties in relationships to third parties. Right. The underlying construct is that within the framework of Pennsylvania law is the same when someone chooses to undertake services to perform services that they know are necessary or should know are necessary for the protection of third parties. When they undertake that service, knowing that it's necessary for the for a third for the protection of another, they assume a corresponding duty of care. So now let's apply that to this case. And I get that they don't agree that that's what they did. And I get that after the fact, their proposition is we were only here to do this thing and not that thing. That's fine. But the question that's a fine as an argument. But if we if we filter this through the framework of Pennsylvania law, the first question is like in the category of let's let's let's read what Pennsylvania law says. Did the person the question did Carlisle undertake to render a service? Yes, they did. I mean, the contract is the entire narrative around the contract is one way that we can sort of tell that story. But to to get to the to get to the focal point of it, what they did, whether it's gratuitous or for compensation, it doesn't really matter. What they did is they chose to put their guy in a room training these folks who are working in this paint mixing facility talking about the equipment. That's a service. Now, on the next question under Pennsylvania law, do they know or reasonably should they know that this is necessary for the protection of others? Of course they do. There's extensive testimony from their corporate representatives, from the management, from Mr. Hager himself, that they all know that this that this equipment is capable of. There's volatile chemicals that these things can ignite, that these things can explode. This is these guys are working in what is potentially a bomb. So they know that my question about reliance, the knowledge is so. So there is also testimony from Mr. Aikman at the Letterkenny facility that they did expect that it would be that they that they don't really know how the equipment works. Carlisle knows how the you have the how the equipment works. So they did expect Carlisle to provide that training. So what exactly is it that people ask you a question about? Are we blurring the lines here between product liability and in 324-A? Because 324-A speaks in terms of services, not products. Right. So 324-A just cures the product, cures the safety manual. They perform no service at that point in time. That's just classic product. So Judge Phipps, I – let me give you a hypothetical. Okay. I hope it's rhetorical because I don't want to be put on the spot too much. No, I've been asking you a question. I'm just proposing a hypothetical. I mean if the scenario here were simply that in the category sort of distinguishing a strict liability, a product claim from a negligence claim, if the context here were simply that Carlisle makes a product and I call Amazon and I get it. I order the thing. It shows up on my doorstep. Yes, it costs $80,000. Yes, it's in fact a complicated system of pumps that I'm going to put in my complicated paint mixing facility. And yes, it's got some warnings that comes in the box. And then something terrible happens. When one sues Carlisle in that context, that looks, Judge Bibasen, feels an awful lot like a product liability, a product liability claim. Excuse me. Yes. Your theory suggests that as soon as they provide an 800 number with some support and a chat line that gives them more than just selling the product, the moment they have like a chat on or frequently asked questions and there's a helpline about like make sure to pay attention to that safety manual and those warning stickers. Then you're suggesting that those are going to amount to services that are covered here. And I just worry that the actor who is better in providing a little bit of service help, it's just like when there's not a service contract, you haven't signed like a training contract or anything. But your theory then suggests that the good actors who offer the support are going to be on the hook as if they've signed a services contract. So, Judge Bibasen, the way and what I would urge around this point. I don't hear a lot of yeses or nos from you. I don't hear you answering these questions, Dr. Beckham. Well, I am. Well, because I'm providing a framing, right? And my framing is that here is that is with respect to Pennsylvania law, to the point of your question, every step that if we're going to take a step back into the language of policy, every step that a person takes into undertaking to render services is a step into the room. Once you know your way into the room, you assume the duty. Now, are you acting reasonably with respect to your undertaking? That is an interesting question, and that is where your question goes. It goes to the reasonableness of the conduct based upon what's been offered and what are the circumstances. In this particular case, without stepping back into theoretically what can this look like and what are the endpoints of potential liability, in this case, this is not a 1-800 number. This is not frequently asked questions. This is a complicated system. They're asked to come and they give a training. That is about a number of things, including not causing the system to explode. I understand you want us to focus on this case, but we have a responsibility to issue a ruling that will make sense three cases down the road. So what are we going to advise the overworked, harried trial judges about at what point this kicks in? It would be clear if we said, okay, did you sign a service contract or not? But when you ask us to focus on, well, in this case, it went a little bit beyond the 800 number and the frequently asked questions and the stickers. But I think your friends on the other side, they've got a rule, right? And you, this blurring of product liability and service contract, I'm just not sure what guidance these sellers have in the future on how far they can go and whether a ruling for you is going to chill them from even offering some minimal installation help or guidance. So, Judge Babis, actually, I would turn that around. I have the rule, and my rule is in the decisions of the Supreme Court of Pennsylvania. And what the Supreme Court of Pennsylvania has said respectfully is that people are accountable, they are potentially liable for their actions. And when they undertake to render services, they assume a corresponding duty of care. And the method, the advice to give the district court is to look to Pennsylvania cases, to look to the Pennsylvania Supreme Court, which has an expansive approach to duty. The questions about potential liability, what are the limits, what – so it all goes to breach of duty certainly in this context. So it's interesting that you talk about the Pennsylvania Supreme Court and duty. It gets to the point – there's a little policymaking on this, right? When the Pennsylvania Supreme Court is going to impose a duty that one owes society in general. And I'm beginning to wonder, like they get to think policy consequence. It's rare for federal courts to ever get to do that, but they get to in the development of the common law. And if we create a duty that says if you do anything other than in your hypothetical the Amazon, if you do anything other than just ship the $80,000 product there, if you want to have, as Judge Biba says, the 1-800 number or provide a little help, you're on the hook. For complete and total duty. Policy-wise, isn't the consequence we're going to provide no help? There will be no safety manual. There will be nothing else like this. Just we want to keep this in the product space because if we come out for ten minutes and just say, oh, hey, make sure you discharge this this way, we could be on the hook for the next 2,000 things that go wrong. So policy-wise, it's a little dangerous to kind of create a duty in this situation. And policy-wise, we're not talking about creating a duty. Policy-wise, the Supreme Court of Pennsylvania has already decided the circumstances under which a duty of reasonable care is assumed. And those circumstances are when the person undertakes to render services. Everything else flows into breach of duty. If there is any ambiguity from your perspective on what the Supreme Court of Pennsylvania has decided, then maybe you would consider certifying this matter to the court. You keep saying Pennsylvania law, and you say you talk about the general origins, but cite a specific case that's like this one. A Pennsylvania court case. I haven't heard you cite one, not even on all fours, on three out of four. What's your best Pennsylvania case that's closest to this situation, recognizing a duty like this? Well, on these facts, there isn't a Pennsylvania case like that. Kage v. Kumar says we're supposed to be very cautious. You talk about breads. I read Kage v. Kumar as narrowness, but you can't cite a case that's close to this. No, but that is a misapprehension of how Pennsylvania case law functions in this space. In Scampone, in Alderwoods, the Supreme Court of Pennsylvania, Chief Justice Saylor, talks about how duty, the way that we evaluate duty in Pennsylvania law, is not granular. It's not case-specific. The granularity of facts generally flow into the analysis of whether the duty has been breached, whether the company here, the company or the defendant, was reasonable or not. But what Scampone says, Alderwood, Kage is a superior court case, the Feld case, all specifically talk about the assumption of a duty of reasonable care as, in fact, a general proposition that then is applied in case-specific scenarios. And if I may, what you are describing, the let's look for a case, let's look for a case that's on fours, and then let's see if the right has been sort of recognized in that space and then corresponding whether it's recognized in this space, that sounds to me an awful lot like what federal courts do in the context of 1983 qualified immunity, where you look for whether there is a case on point. Has the recognized, has the right been recognized within this sort of a reasonable, factual, a reasonably correspondent factual circumstance? And in the landscape of constitutional analysis, that sort of qualified immunity approach is, of course, the conventions of the court. And that is fine. And that's what you do in the context of qualified immunity analysis. But this is not a qualified immunity analysis. And the Pennsylvania Supreme Court has said emphatically that duty is indeed a broad policy question. And Judge Phipps, we're not, we are not talking here about your creating a duty. It's not for you to create a duty. The Supreme Court of Pennsylvania in Scampone and in other cases that we say in a brief talk about the broad construction of the duty of reasonable care and the fairly straightforward proposition that whether a duty, whether that duty of reasonable care is assumed is a function of choice. And here the defendant made a choice. They made a choice to enter it, to engage with, to sell the product, to warn about the product, to train on the product and to train on the dangers of the product and everything else runs to reasonableness, not to whether there is a duty as a threshold matter. We understand. We're hearing a rebuttal. Okay, thank you. I appreciate it. Thank you, Your Honor. May it please the court. Glenn Campbell from Post and Shell representing Carlyle Fluid Technologies in this matter. I think Your Honors have hit the point exactly as to why the judge below and why this court should affirm the judge below with regard to the issue that's being presented here. The evidence in this case, viewed in a light most favorable to the plaintiff, shows that Carlyle undertook a limited duty with regard to training of the employees of Letterkenny Army Depot with regard to the new equipment that was supplied in connection with the upgrade to the paint kitchen. Mr. Kim, there was some back and forth in the briefs about a second training session. Yes. Was there a second training session? There was, but not with Carlyle. So the testimony is that Al Aikman, who was the gentleman who was in charge of this project for Letterkenny, brought back a contractor, quote unquote, a contractor for a second training session. The evidence in this case, through the testimony of Jim Lansdorf, is that the second training session was by a company called Sam's Kremlin. So let me just give you a little background. So the way this paint kitchen operates is that there is paint, there is reducer, and there is paint thinner that goes out to these various paint booths. And in the paint booths, there are paint guns that the painters use to paint the equipment. The way that it works is that the paint kitchen has the pumps to pump out the material. So in early May of 2018, the individuals from Carlyle came to the site to assist with startup. They were requested to do limited training to show the operators how to operate the equipment. That's what Mark Hagedorn did. That's what Dave Martinson did. Two weeks later, there was another contractor that was used by Schweitzer & Crossen by the name of Sam's Kremlin. They were the ones who had the paint guns and also the paint carousel that was connected to the paint kitchen. So the training that was provided by two weeks later was by a contractor named Sam's Kremlin. There's no evidence that anybody from Carlyle ever came back in order to provide any additional training. My understanding of Mr. Hagedorn's testimony, he did not train operators, correct? So Mr. Hagedorn, his testimony was that he was told by Mr. Aikman that there were no operators available. So his assumption was that he was not training operators. However, there is testimony that some of the gentlemen who did come for the training sessions were operators. So if you view the evidence in the light most favorable to the plaintiff, then you assume that there were painters slash operators who attended this training. So we're not disputing that operators attended, despite what Mr. Hagedorn's testimony was. When you talk about Faribault, there's a construction manager in Faribault. What is it that makes these on-site contractors different? So in the Faribault case, which was decided by the Pennsylvania Supreme Court, the court was faced with two issues, two appeals from summary judgment. One on behalf of the PA Turnpike Commission, one on behalf of Trumbull, which was the construction manager. The Pennsylvania Supreme Court found, based upon the contractual undertaking by Trumbull, that they owed a duty of safety with regard to the construction project. Their contract specifically said that they would inspect and monitor for safety with regard to construction. So under 324A, the court found that there was a contractual undertaking. In this case, Judge Wilson reviewed the contract and found that Carlisle did not undertake to provide any training with regard to the products that it was supplying to Letterkenny RV Depot. And, you know, we don't dispute that you can have an undertaking either by contract or by specific actions on the part of the defendant. But in this case, it appears that the plaintiffs are not arguing that there was a contractual undertaking by Carlisle. I can address that, but if that's not really the issue that's being raised by the plaintiffs, I would move on. But Faribault, that's how I would distinguish the Faribault case. There was an actual contractual undertaking. So, I mean, we just get to this point where Carlisle came out and provided a training session. Doesn't that include a duty to cover how to properly handle paint thinners and what the proper clothing should be when you're using paint thinners? No. A couple of reasons why. First of all, the pumps that were actually at issue here were not part of Carlisle's contract. Carlisle made the pumps, but Schweitzer & Crossen is the one who supplied and installed them. So, if you want to look at what Carlisle's actual contract was, it didn't include the pump that was used for the paint thinner. But even if it did, so I want to be really specific here with regard to what the plaintiff's argument is with regard to the cause of this incident. So, plaintiffs produced reports, one of them by a company called Exponent, which was a cause and origin expert. They determined that the fumes from the paint thinner drum are what was ignited in this incident. And they determined that it was static electricity from an employee that caused this. They ruled out grounding. They basically said grounding wasn't an issue. The only issue, the only criticism that Exponent had was of the training with regard to the PPE, the personal protective equipment, and the clothing that the operator should wear. That was it. So, the question then is, and well, then they had another expert by the name of Scott Davis from Gexcon, who essentially took that argument and applied it to Carlisle. So, the question here is, did Carlisle assume a duty, not with regard to an overall safety training, not anything like that, but to actually warn the users of this equipment of the hazards of paint thinner and the need to wear personal protective equipment? That was covered by Letterkenny in their training of these operators. There's plenty of evidence with regard to that. They had hazardous communication training. One of the individuals who was actually passed away because of the injuries from this was the hazardous chemical expert from Letterkenny. So, you're basically saying that just because our pump, which we didn't supply but we actually made, was somehow attached to the drum, then therefore we need to tell them everything there is to know with regard to how to safely handle the drum. Just because it's connected, it has nothing to do with the actual operation of the pump. It has to do with moving a barrel. And they do this at Letterkenny Army Depot in this building and all the other buildings on a daily basis. They move paint thinner drums, not just from the paint kitchen, but in multiple operations. So, essentially, the argument is we should have provided training on something that they do every day, not just in the paint kitchen, but everywhere else. As a result of you supplying – your client supplying the pump? Supplying – well, manufacturing the pump. So, you manufacture – and so do you think that when you show up to do training on the pump, you have some duty to provide training about safe operation of the pump? So, again – I'm not talking moving the drum. I'm talking the pump itself. Do you think you have a duty in that respect? Yes, with regard to how the pump operates, with regard to how essentially it functions, and that's really what the training was. Again, it was operational training. Does it include safely operating the pump? Yes, but again, what is at issue here is not the operation of the pump. It's changing out a drum. So, it's a different issue. It's a different concept. So, what if during that training that might be related to the safe issuing of the – the safe operation of the pump, your trainer began to talk about the volatile nature of paint thinner and what's in the drums? Does – as soon as your trainer crosses that threshold, are they now in this undertaking of a gratuitous service that's going to cause them to have to explain everything else? Or do we just sit there and say, nope, you're confined. You're the pump manufacturer. You're here just to talk about the safety of the pump and anything you say beyond the pump you have no duty for? Well, the law is that the duty is limited to the scope of the undertaking. So, under your example there, if Mr. Hagedorn said, oh, yeah, it's paint thinner, but don't worry about it. It's not explosive. You don't have to worry about anything with regard to that. There could be liability for that because he undertook to provide safety instruction with regard to the volatility of the paint thinner that was wrong. So, if he was negligent in doing that, there could be liability because he undertook to do that. But if he never undertook to say, oh, and then you need to do X, Y, and Z as well, then there's no liability there because it wasn't part of the scope of the actual undertaking. And, you know, one of the cases that Mr. Becker has talked about is the Feldman or Feld versus Merriam case, which, you know, it's interesting that he talks about one part of the case, but completely ignores the really important language with regard to that case. So, in that case, this Pennsylvania Supreme Court, the question was whether a landlord could be liable for injury to third parties because of criminal activity on the landlord's premises. In that case, the court said because they undertook a program of security, there could be liability. However, what the court said, and I'll just read, a tenant may not expect more than what is offered. If, for instance, one guard is offered, he cannot expect that two guards would be provided, nor may he expect the benefits that a different program might have provided. He can only expect the benefits reasonably expected of the program as offered, and that program will be conducted with reasonable care. So, if you apply that to the circumstances of this case, Carlisle was asked to do very limited training, one hour on three different shifts with regard to the operation of the equipment. The evidence is that they provided that training. Now, plaintiff is saying, you should have done more, but that's not what the law requires. That's not what FELD requires. Essentially, plaintiff is saying, well, Carla, you provided one guard, but you should have provided two guards, and that's the argument that was rejected by the Pennsylvania Supreme Court in the FELD case. Another similar case, Sheridan versus NGK, which came from this court in 2008. That involved a discharge of chemicals from a battery plant, I believe, in Redding, PA. There was a contract that a company called Spot Stevens McCoy, an engineering firm, had in order to monitor the levels of lead that were coming out of the emissions. Some people around the facility sued the plant and sued Spot Stevens and McCoy, saying that they had a duty. This court said that they had undertaken to do certain things, but they did not undertake to do what it was that the plaintiff said, which is essentially tell them or warn them of excessive levels of lead that were being emitted from this plant. So this court said, in that circumstance, their undertaking was limited, and they did not undertake to do what it was the plaintiffs were arguing that they do, and therefore there was no duty. One thing I would point out with regard to one of the cases that the plaintiffs have cited to, there are a number of cases, Scampone cases from Pennsylvania. There's a Superior Court case, a Supreme Court case, and another Superior Court case. Plaintiffs in this case seem to be arguing that this court should apply what are called the all-house factors in determining whether there was a duty on the part of Carlisle. Essentially, the argument is that because the law doesn't recognize a duty, this court should create one. But the case Scampone 3, which was the Pennsylvania Superior Court case on remand, the court basically said that the all-house factors only apply or should only be applied where there's not essentially a duty that's created under the law. So here, the duty is dictated by 324A. And if this court were to accept the plaintiff's argument, essentially broaden the duty far beyond what 324 allows under clear Pennsylvania case law and this court's law, essentially it would be obliterating 324A. That rule, essentially, and the case law that has examined that rule has said that, again, the scope of the undertaking limits the scope of the duty or the extent of the undertaking limits the scope of the duty. So if this court were to say, well, we're not going to just look at what the actual undertaking was. We're going to look far beyond that. We're going to say, oh, well, this is what Carlisle could have done or should have done. Then there's really no need for 324A. And all the case law that has preceded us being here today essentially becomes a novelty. So I think that addresses the points that I wanted to address with your honors. Thank you very much. Thank you very much, Mr. Scampone. Thank you, Your Honor, for allowing me a brief rebuttal after giving me a little extra time on the front end. My learned friend mentioned the failed case, which is, of course, the Supreme Court of Pennsylvania case, which is emphatically my case, not his case. The very point of the failed case was that the Supreme Court of Pennsylvania found that the proper framework for assessing whether the defendant had assumed a duty was whether they undertook to render services for the protection and safety of another. Whether they violated that, whether they breached the duty, whether they breached the duty, whether they were reasonable or unreasonable under the failed case as set forth in that decision by the Supreme Court would implicate a discussion about the scope of the program that was offered. The scope of the program and failed has to do with the question of breach, not with the question of whether the duty was assumed in the first instance. That's why failed and also Scampone and Alderwoods all are all are all exactly in a line focusing the inquiry, not around the creation of a duty. This is not an althouse case where we're talking about some new landscape and someone's we're asking the courts to construct a duty as a matter of law and some novel factual or legal or frame framework. This is a case certainly from our perspective that speaks to very traditional propositions of Pennsylvania law that are embedded in old decisions like failed. I just want to ask you one question and just try to tell me if you agree with this proposition or not. Sure. Scope of the duty corresponds to the scope of the undertaking, true or false? Half true. Half true. The duty is the duty of reasonable care, right? The duty of reasonable care attaches to the undertaking. So the question is, what is the scope? The question is never what is the duty? There's only one duty. It's the duty to act reasonably under the circumstances. There's never it's never the duty to do X or the duty to do Y. Whether you should do X or Y under Pennsylvania law is a question of whether you have afforded with your responsibility to act reasonably or not reasonably. So Judge Phipps, the way the Pennsylvania law conceives this is that the duty to act reasonably attaches to the undertaking. So it's not a question of the scope of the duty. There is simply the duty to be reasonable. But the duty but the obligation to be reasonable attaches to the fullness of the undertaking. That's how the Supreme Court of Pennsylvania talks about this. So that's why I'm quarreling a little bit with the proposition of scope, right, around the duty of reasonable care. Because to me the scope of the duty of reasonable care is the idea of scope isn't really apt. It is the obligation to be reasonable in the fullness of the undertaking that one has undertaken. This conversation itself that you are having with Mr. Campbell speaks to the lack of distinction, the integration of operations and safety. They are part and parcel of the same thing. And that is made clear by Mr. Hagedorn's testimony, you know, for sure. But also I think again illustrated by the discussion you were having where even when you're talking about operations, you're also talking about safety. Under Pennsylvania law, if this case is in the Pennsylvania Supreme Court, respectfully, this is not a hard case. This is a straightforward case as to whether Carlisle has assumed a duty. Did they assume a duty of reasonable care by virtue of assuming to render services for the protection of another? Of course they did. Did they violate the duty of care? Were they unreasonable under the circumstances? That is another question. That is a question that can go to a judge on summary judgment. That's a question that can go to a jury. But everything here funnels to breach, not to the question of duty. Thank you. Thank you, Your Honors. I appreciate your time. Thank you, counsel, for your brief and your argument. We'll take the matter under advisement. Thank you.